

FILED

JAN 2 0 2006

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| DANIELLE LIVINGSTON and<br>SIOUX VALLEY HOSPITAL, | \*<br>\*<br>\* | CIV 04-4139<br>**2006 D.S.D.  1** |
| Plaintiffs, | \*<br>\* |  |
| -vs- | \*<br>\* | OPINION AND ORDER |
| SOUTH DAKOTA STATE MEDICAL<br>HOLDING COMPANY, INC., d/b/a<br>DAKOTACARE, | \*<br>\*<br>\* |  |
| Defendant. | \*<br>\* |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

### INTRODUCTION

[¶1]    Plaintiffs brought suit against Danielle Livingston's ("Livingston") employer, Wakonda Heritage Manor ("Manor"), and Manor's group health insurance carrier, South Dakota State Medical Holding Company, Inc. ("DakotaCare"), challenging DakotaCare's denial of group health insurance benefits to Livingston and her new-born baby, contending that the denial violates the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-68 ("COBRA"), and the Health Insurance Portability and Accountability Act, Pub.L. No. 104-191, 110 Stat.1936 (relevant provisions codified at 29 U.S.C. § 1181 *et seq.*) ("HIPAA").  Manor was dismissed as a party defendant pursuant to the stipulation of the parties.  The plaintiffs and DakotaCare have filed cross motions for summary judgment.  Following all briefing on the summary judgment motions, defendant filed a motion to "supplement" its claimed facts and to support those claimed facts with two affidavits.

### DECISION

[¶2]    The summary judgment standard is well known and has been set forth by this Court in numerous opinions.  *See* <u>Hanson v. North Star Mutual Insurance Co.</u>, 1999 D.S.D. 34 ¶ 8, 71

F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Tripp County, 1998 D.S.D. 38 ¶ 8, 66

F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 D.S.D. 34 ¶ 7,

22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 D.S.D. 26 ¶ 2,

17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary Judgment is proper where there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). "A

material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a

verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th

Cir. 1995). In considering a motion for summary judgment, this Court must view the facts in the

light most favorable to the non-moving party and give the non-moving party the benefit of all

reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98. As already

noted, the parties have filed cross-motions for summary judgment. Where the parties file cross-

motions, the standards by which the Court decides the motions do not change. Each motion must

be evaluated independently, "taking care in each instance to draw all reasonable inferences

against the party whose motion is under consideration." Heublin Inc. v. United States, 996 F.2d

1455, 1461 (2nd Cir. 1993). *See also* Bakery and Confectionery Union and Industry International

Health Benefits and Pension Funds v. New Bakery Co. of Ohio, 133 F.3d 955, 958 (6th Cir.

1998).

[¶3]    Almost all facts material to the motions are not in dispute. Livingston was hired as a full

time employee of Manor in October of 2002. One of the benefits of full time employment was

eligibility to enroll, after a 60 day waiting period, in group health insurance coverage provided by

DakotaCare. Livingston did not elect DakotaCare coverage during the regular enrollment period

because she and her children were eligible for Medicaid. On May 6, 2003, she gave birth to a

child 15 weeks prematurely. She did not return to work until June 19, 2003, when she returned

to work on a part time basis. She resigned from her position and her employment with Manor

was terminated on August 29, 2003.

[¶4]    On June 4, 2003, within 30 days of the birth of her son, Livingston applied for

DakotaCare benefits for herself and her child. DakotaCare denied the application for coverage

based upon information from Manor employee Judy Swenson ("Swenson") that Livingston was

then working only part time. The fact is, however, that Livingston was not on June 4, 2003, working at all. The fact is also that Livingston was a full time employee when her baby was born. Manor did not do anything to ever attempt to change Livingston's status. Nor could they have done so. For example, if a qualified employee has a baby, can the employer change the employee's status so as to prevent the employee and the child from being eligible to be enrolled and asking to be enrolled, e.g. by firing her or suspending her? The answer is clearly "No."

[¶5]    DakotaCare informed Swenson that coverage was denied because part time employees were not eligible, the Family Medical Leave Act was not applicable[1], and Manor had no formal leave policy on file with DakotaCare. Manor did have a leave policy set forth in the employee handbook but Manor did not notify Dakotacare of the policy. Livingston did not fill out any paperwork in conjunction with a formal leave of absence. Nonetheless, she was informally granted a leave during which Manor did not expect her to return to work. Manor admitted in its answer to the complaint in this action that Livingston was on leave status. That admission is binding. Her employment was not terminated during this time and no paperwork was initiated by Manor reclassifying her as a part time employee. She was not at work from May 6, 2003, until June 19, 2003, and Manor had no objection to that.

[¶6]    There is also nothing to indicate that Livingston knew that Manor was required to file its leave policy with DakotaCare or that Manor had failed to do so. Any problem with filing a leave policy would not be the problem of plaintiffs.

[¶7]    Livingston did not formally appeal from the denial. When and how she became aware of the denial is not clear. Dakotacare sent no notice to Livingston. The record does not show that Livingston personally would have had a copy of the DakotaCare plan setting forth the appeal procedure.

[¶8]    Plaintiff Sioux Valley Hospital ("Sioux Valley") received some payment for Livingston's medical bills through Medicaid. Livingston is not personally responsible for the bills at issue here. She has signed an assignment of any right she may have to payment of benefits from DakotaCare to Sioux Valley.

---

[1]Manor did not have over 50 employees at that time.

[¶9]    DakotaCare contends that its discretionary decision, as plan administrator, to deny benefits is subject to an abuse of discretion standard.  As a general proposition, this would normally be true.  Plaintiffs contend that, pursuant to HIPAA, defendant had no discretion to deny benefits to Livingston.  In any event, plaintiffs contend that DakotaCare does not qualify for deferential review because it has a pecuniary conflict of interest[2] and because DakotaCare never directly sent Livingston a denial letter or a formal request for additional evidence in support of her application for coverage.

[¶10]    Defendant contends that Livingston failed to exhaust her administrative remedies under the DakotaCare plan, precluding any ERISA claim in federal court.  Plaintiffs again resist on the basis that DakotaCare never formally informed Livingston of the denial of benefits but instead only corresponded with a Manor employee.  Plaintiffs further contend that DakotaCare's plan does not clearly require exhaustion, that exhaustion would be futile, and that DakotaCare is estopped from asserting failure to exhaust because it sent a letter specifically denying what DakotaCare construed as an appeal letter.

[¶11]    Finally, defendant contends that Sioux Valley lacks standing to bring an ERISA action.  Sioux Valley contends that ERISA does not preclude suit by an entity that has a valid assignment which is authorized both under DakotaCare's plan and under South Dakota law.

**I. Standing.**

[¶12]    Standing is a threshold matter that, if absent, prevents this Court from exercising jurisdiction.  Arkansas Right to Life State Political Action Comm. v. Butler, 146 F.3d 558, 560 (8th Cir. 1998). *See* Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012-13 (1998) (holding that federal courts may not consider other issues before resolving standing, an Article III jurisdictional matter).  Standing in this case turns on the source of the plaintiffs' claim for relief.  Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).  "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to

---

[2]The medical bills in conjunction with the premature birth of Livingston's son approach three quarters of a million dollars.  He was hospitalized for five months following his birth.

4

judicial relief." *Id.*  DakotaCare contends that Sioux Valley lacks standing.  No claim has been advanced that Livingston lacks standing.  It is sufficient to confer standing that at least one of the plaintiffs qualifies and, if so, the court does not need to consider the standing issue as to the other plaintiff in the action.  Bowsher v. Synar, 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986), Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

[¶13]   In any event, under 29 U.S.C. § 1132(a)(1)(B) (1988) a "participant" in a plan or a "beneficiary" may sue to collect benefits owing under a plan.  Lutheran Medical Center of Omaha, Neb. v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan, 25 F.3d 616, 619 (8th Cir. 1992), abrogated on other grounds, Martin v. Arkansas Blue Cross and Blue Shield, 299 F.3d 966 (8th Cir. 2002).   The Eighth Circuit holds that "nothing in ERISA prohibits a plan participant from assigning a cause of action to a health care provider after the services have been rendered and the loss incurred, nor [is there] any language suggesting Congress intended to restrict such assignments.  Denying standing to health care providers as assignees of beneficiaries may undermine the goal of ERISA, namely to improve benefit coverage for employees."  Lutheran Medical Center,  25 F.3d at 619.  The court determines that standing exists.

## II. Exhaustion of Administrative Remedies.

[¶14]   The United States Court of Appeals for the Eighth Circuit has held that "although ERISA itself contains no exhaustion requirement, beneficiaries must exhaust their administrative remedies if such exhaustion is mandated by the ERISA plan at issue."  Burds v. Union Pacific Corp., 223 F.3d 814, 817 (8th Cir. 2000).  "It is well-established that when exhaustion is clearly required under the terms of an ERISA benefits plan, the plan beneficiary's failure to exhaust her administrative remedies bars her from asserting any unexhausted claims in federal court."  *Id.*

[¶15]   "ERISA plan beneficiaries are not required to exhaust their claims if they can demonstrate that exhaustion 'would be wholly futile.'"  Burds v. Union Pacific Corp., 223 F.3d at 817 n.4 (*citing* Glover v. St. Louis-San Francisco Ry., 393 U.S. 324, 330, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969)).  Requiring Livingston to exhaust DakotaCare's administrative remedies would be futile because there is no indication that the position taken by DakotaCare in its denial

5

of benefits, answer to the complaint, and summary judgment materials would be subject to change if Livingston participated in a formal administrative review process. Livingston has established that she has no further duty to exhaust administrative remedies. Defendant's motion for summary judgment on the basis of failure to exhaust should be denied.

[¶16]   Denial of defendant's motion for summary judgment on the exhaustion issue is also appropriate because DakotaCare's plan does not clearly require exhaustion prior to bringing a claim under ERISA. The plan provides in section XII that "if a member" has a complaint regarding any matter pertaining to coverage under the plan, a written complaint "may" be directed to DakotaCare's CEO. If "the member" is not satisfied with the CEO's decision, he or she "may" appeal that decision to the board of directors. DakotaCare maintains that Livingston is not and does not qualify as a member of the plan so she technically would have no appeal rights under the plan. The plan's permissive language does not qualify as a clear exhaustion requirement. In any event, genuine issues of fact[3] exist as to whether Livingston ever received formal notice of the denial of benefits so as to trigger the right to appeal and whether subsequent correspondence between the parties satisfies the plan's exhaustion procedures. These issues would preclude summary judgment in favor of DakotaCare.

**III. Standard of Review.**

[¶17]   The parties spend considerable time arguing about the appropriate standard of review under ERISA of DakotaCare's decision to deny healthcare benefits to Livingston. Where an employee benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the courts must give deference to the administrator's eligibility determinations. Finley v. Special Agents Mut. Ben. Ass'n, Inc., 957 F.2d 617, 619 (8th Cir. 1992). Section XV of the DakotaCare plan gives DakotaCare discretion to determine eligibility for benefits. However, even under the abuse of discretion standard this court is required to consider whether DakotaCare's decision denying benefits to Livingston conflicts with the requirements of ERISA. Cavegn v. Twin City Pipe Trades Pension Plan, 333 F.3d 879, 883 (8th Cir. 2003). See also Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355,

---

[3]Those facts are not material facts because, as set forth previously, exhaustion is not required in this case.

385, 122 S.Ct. 2151, 2169, 153 L.Ed.2d 375 (2002) (denial cannot conflict with anything in the text of the statute).

## IV.  HIPAA Special Enrollment Period.

[¶18]   There is no genuine issue of material fact that Livingston applied for benefits prior to the expiration of 30 days from the birth of her son or that DakotaCare denied benefits based upon the assumption that Livingston was not, on the date of her application, a full time employee eligible for benefits under DakotaCare's plan.  The issue here is whether DakotaCare erred in denying benefits because the denial conflicts with the requirements of ERISA.  If so, discretion or abuse of discretion is immaterial.

[¶19]   The HIPAA provisions of ERISA require group health plans to contain special enrollment provisions:

> (A) In general
> If--
>> (i) a group health plan makes coverage available with respect to a dependent of an individual,
>> (ii) the individual is a participant under the plan (or has met any waiting period applicable to becoming a participant under the plan and is eligible to be enrolled under the plan but for a failure to enroll during a previous enrollment period), and
>> (iii) a person becomes such a dependent of the individual through marriage, birth, or adoption or placement for adoption,
> the group health plan shall provide for a dependent special enrollment period described in subparagraph (B) during which the person (or, if not otherwise enrolled, the individual) may be enrolled under the plan as a dependent of the individual, and in the case of the birth or adoption of a child, the spouse of the individual may be enrolled as a dependent of the individual if such spouse is otherwise eligible for coverage.
> (B) Dependent special enrollment period
> A dependent special enrollment period under this subparagraph shall be a period of not less than 30 days and shall begin on the later of--
>> (i) the date dependent coverage is made available, or
>> (ii) the date of the marriage, birth, or adoption or placement for adoption (as the case may be) described in subparagraph (A)(iii).
> (C) No waiting period
> If an individual seeks to enroll a dependent during the first 30 days of such a dependent special enrollment period, the coverage of the dependent shall become effective–

7

(i) in the case of marriage, not later than the first day of the first month beginning after the date the completed request for enrollment is received;
(ii) in the case of a dependent's birth, as of the date of such birth; or
(iii) in the case of a dependent's adoption or placement for adoption, the date of such adoption or placement for adoption.

29 U.S.C. § 1181(f)(2).  The administrative rules provide, in part:

(3) Applying for special enrollment and effective date of coverage--

(i) Request. A plan or issuer must allow an individual a period of at least 30 days after the date of the marriage, birth, adoption, or placement for adoption (or, if dependent coverage is not generally made available at the time of the marriage, birth, adoption, or placement for adoption, a period of at least 30 days after the date the plan makes dependent coverage generally available) to request enrollment (for the individual or the individual's dependent).
(ii) Reasonable procedures for special enrollment. [Reserved]
(iii) Date coverage must begin--
(A) Marriage. In the case of marriage, coverage must begin no later than the first day of the first calendar month beginning after the date the plan or issuer receives the request for special enrollment.
(B) Birth, adoption, or placement for adoption. Coverage must begin in the case of a dependent's birth on the date of birth and in the case of a dependent's adoption or placement for adoption no later than the date of such adoption or placement for adoption (or, if dependent coverage is not made generally available at the time of the birth, adoption, or placement for adoption, the date the plan makes dependent coverage available).

29 C.F.R. § 2590.701-6(b)(3).  DakotaCare's plan was required by HIPAA to comply with the foregoing dependent special enrollment rights.

[¶20]   HIPPA requires DakotaCare's plan to "allow an individual a period of at least 30 days after the date of . . . birth . . . to request enrollment." 29 C.F.R. § 2590.701-6(b)(3).  The birth of Livingston's child triggered the 30 day special enrollment period.  There is no genuine issue of material fact that Livingston was eligible, as defined in 29 U.S.C. § 1181(f)(2), on May 6, 2004, to enroll in her employer's DakotaCare health care insurance plan.  HIPAA's special enrollment provisions make her eligible for up to 30 days thereafter.  The 30 day special enrollment period

operates to backdate coverage to the date of birth. Under the statute, on the date of coverage, Livingston was a full time employee and otherwise eligible.

[¶21]   DakotaCare maintains that on the date Livingston attempted to be enrolled, June 4, 2003, she was no longer a full time employee entitled to plan benefits and thus not eligible to elect coverage on that date. The facts are in dispute as to what Livingston's employment status was on that date. However, her status on June 4, 2003, is not determinative. It is clear that Livingston's employment was not terminated until later. It is somewhat unclear what her status was - sick leave, vacation, unpaid leave, or authorized absence. It was clearly not an unauthorized absence. Her employer authorized it.

[¶22]   HIPAA does not specifically require that Livingston have returned to work in a full time capacity on the date the special enrollment election is made. The statute is silent on the issue raised by defendant. To resolve the issue, we must examine the language of ERISA and its HIPAA provisions, "guided not by 'a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object and policy.'" John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 94-95, 114 S.Ct. 517, 523, 126 L.Ed. 2nd 524 (1993) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987), and Kelly v. Robinson, 479 U.S. 36, 43, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986)). ERISA, its COBRA and HIPAA provisions included, "is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans." McGee v. Funderburg, 17 F.3d 1122, 1124 (8th Cir. 1994). One of the purposes in enacting HIPAA was to "improve portability and continuity of health insurance coverage in the group and individual markets." H.R. REP. 104-496(I), 1, 1996 U.S.C.C.A.N. 1865, 1865. DakotaCare's interpretation of HIPPA's dependent special enrollment provision would defeat Congressional intent to allow employees to elect health insurance for either themselves or their child or both upon the birth of a child.

[¶23]   DakotaCare's denial of coverage amounts to a requirement that the employee be actively at work and not disabled during at least a part of the 30 day special enrollment period. However, HIPAA specifically prohibits discrimination with regard to eligibility for enrollment based upon, inter alia, health status, medical condition, or disability. 29 U.S.C. § 1182(a)(1). The

9

regulations prohibit a plan from establishing a rule for eligibility "based on whether an individual is actively at work (including whether an individual is continuously employed), unless absence from work due to any health factor . . . is treated . . . as being actively at work." 29 C.F.R. § 2590.702(e)(2). It is clear from reading HIPAA and its regulations that Congress intended to expand eligibility for health care coverage for newborns and their parents. DakotaCare is not authorized to limit the 30 day special enrollment period by imposing restrictions that, in many cases, would eliminate the right to elect coverage.[4]

[¶24]   There is no genuine issue of material fact that, on the day of the birth of her son, Livingston and her son were eligible for coverage. HIPAA authorized her, on that date, and for 30 days thereafter, to take advantage of a special enrollment period. As a matter of law, DakotaCare denied Livingston her statutory rights when it denied coverage based upon the fact that she was not, during the special enrollment period, actively at work full time. Plaintiffs are entitled to summary judgment on this issue.

## V.  COBRA Continuation Benefits.

[¶25]   Plaintiffs contend that, as a matter of law, Livingston is entitled to COBRA continuation of coverage benefits. Defendant's only response is that Livingston never became eligible for health care benefits under the DakotaCare plan and therefore she is not eligible for COBRA benefits.

> "COBRA was enacted in 1986 as a legislative response to 'reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.'" *Gaskell v. Harvard Co-op Soc'y*, 3 F.3d 495, 498 (1st Cir.1993) (quoting H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.C.C.A.N. 42, 579, 622). "In 'an effort to provide continued access to affordable private health insurance for some of these individuals,'" without increasing the staggering budget deficits now facing the United States, COBRA compels employers that sponsor certain group health plans to provide qualified beneficiaries with the

---

[4]The Family Medical Leave Act requires certain employers to allow up to 12 weeks unpaid leave after the birth of a child. DakotaCare would deny coverage to all mothers who cannot or do not return to full time employment within 30 days after the birth unless their employer had a leave of absence policy and granted a leave. Any employee (and newborn babies of the employee) of a company covered by the FMLA could not qualify if the employee took the leave.

> option of receiving self-paid continuation coverage for eighteen or
> thirty-six months after a qualifying event which would otherwise result in
> termination of coverage. *Gaskell*, 3 F.3d at 498 (emphasis added) (quoting
> H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986
> U.S.C.C.A.N. 622); 29 U.S.C. §§ 1161(a), 1162(2)(A). The period of
> entitlement to continuation coverage may be shortened on the occurrence
> of certain events, including the employer ceasing to provide any group
> health plan to any employee; failure of the qualified beneficiary to pay
> premiums; and coverage by another group health plan or entitlement to
> Medicare benefits. 29 U.S.C. § 1162(2)(B), (C), (D)(i) and (ii). ERISA,
> as amended by COBRA, is remedial legislation which should be liberally
> construed to effectuate Congressional intent to protect employee
> participants in employee benefit plans. *Landro v. Glendenning*
> *Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir.1980); *see also Smith v.*
> *CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984); *Rettig v.*
> *Pension Ben. Guar. Corp.*, 744 F.2d 133, 155 n. 54 (D.C.Cir.1984).

McGee v. Funderburg, 17 F.3d 1122, 1124 (8th Cir. 1994).

[¶26]   COBRA's purpose is to prevent gaps in health care coverage. Continued health care insurance under COBRA begins immediately upon expiration of coverage under the employer's plan, 29 U.S.C. 1162(2), even though the employee has at least 60 days within which to elect such coverage, 29 U.S.C. § 1165(a)(1). Employees covered under an employer's health care plan are entitled to notice of COBRA benefits upon the "termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment." 29 U.S.C. § 1163(2). There is no genuine issue of material fact that neither Manor nor DakotaCare gave Livingston notice of her right to elect COBRA coverage which right she had pursuant to 29 U.S.C. § 1166(a)(2). There is also no genuine issue of material fact that DakotaCare denied coverage to Livingston under both her claim that she and her child were entitled to enroll with an effective date retroactive to May 6, 2003, and her claim that she was at some point thereafter entitled to COBRA continuation benefits. Plaintiffs are entitled to bring an action to recover COBRA benefits due to Livingston and her son under DakotaCare's plan. 29 U.S.C. § 1132(a)(1)(B).

[¶27]   The United States Court of Appeals for the Eighth Circuit recently explained:

> COBRA requires that a group health plan provide, "at the time of
> commencement of coverage under the plan, written notice to each covered
> employee . . . of [his COBRA] rights." 29 U.S.C. § 1166(a)(1). Those

11

rights include the sponsoring employer's obligation to offer continuation
coverage to employees and their spouses for at least eighteen months
following a "qualifying event" that results in a loss of group health plan
coverage. *See* 29 U.S.C. §§ 1161(a), 1162(2), 1163. When a qualifying
event occurs, the plan administrator must give a timely additional notice of
the right to elect continuation coverage. *See* 29 U.S.C. § 1166(a)(4). A
plan administrator that fails to meet either or both of these notice
requirements "may in the court's discretion be personally liable to such
participant or beneficiary in the amount of up to $100 a day from the date
of such failure . . . and the court may in its discretion order such other
relief as it deems proper." 29 U.S.C. § 1132(c)(1).

Delcastillo v. Odyssey Resource Management, Inc., No. 04-3676, 2005 WL 3501355 (8th Cir.
December 23, 2005).

[¶28]   No notice was given to Livingston at the time coverage commenced under the law. The
reason is obviously because DakotaCare decided Livingston and her baby were not eligible under
the plan. The plan, however, as previously discussed must comply with the law and it does not.
Therefore, Livingston was entitled to the initial COBRA notice at least by June 4, 2003.

[¶29]   We know also that the obligation to provide the initial COBRA notice starts "at the time
of commencement of coverage under the plan." 29 U.S.C. § 1166(a)(1). That date was June 4,
2003, as a matter of law.

[¶30]   The court must determine whether and, if it did occur, when a qualifying event occurred.
26 C.F.R. §54.4980B-4, Q&AA-1(c) tells us that a qualifying event is an event that "causes the
covered employee . . . to lose coverage under the plan." This fits with the statutory language of
29 U.S.C. § 1163. The employer is required to notify the plan administrator of a qualifying event
within thirty days (29 U.S.C. § 1166(a)(2)) and the plan administrator is then required to notify
the plan beneficiary within fourteen days after receiving the required notice from the employer.
*See* 29 U.S.C. § 1166(c).

[¶31]   Obviously, plaintiffs would have no "standing" if Livingston was never covered by the
plan. To put it another way, coverage must be "lost" before COBRA coverage may begin. The
court has determined that Livingston was covered by the plan because the law requires it. We
know that Livingston returned to work with Manor on June 19, 2003, but then on a part time
basis only. She continued in that status until she left her employment with Manor on August 29,

2003. Clearly, COBRA notice was required on either June 19 or August 29. She was back at work but only on a part-time basis. I find that the "qualifying event" was June 19, 2003. Manor did not give the required notice to DakotaCare and DakotaCare did not give the required notice to Livingston. COBRA violations exist. What relief should be granted will be determined at a later date. It is clear that DakotaCare was not prejudiced by the failure of Manor to give notice of any qualifying event. DakotaCare already had that information and would not have extended COBRA coverage in any event.

[¶32]   There are still genuine issues of material fact as to whether and how much premium Livingston would owe for DakotaCare health insurance benefits, how long such coverage was available to her under COBRA, and whether her benefit period was cut short by any event.

**VI. Supplemental Affidavits.**

[¶33]   Defendant has sought leave to file supplemental affidavits to dispute plaintiffs' statement of facts concerning 1) whether Livingston was employed full time on June 4, 2003, and 2) whether a DakotaCare employee sent an internal memorandum admitting that Livingston was entitled to coverage. Neither affidavit would create a genuine issue of material fact in resistance to plaintiffs' motion for summary judgment nor would they establish the absence of a genuine issue of material fact in support of defendant's motion for summary judgment.

[¶34]   The Swenson affidavit contradicts her sworn deposition testimony and thus should not be considered for the purposes of summary judgment. Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1088 (8th Cir. 2001). It is proper to consider an affidavit if it clarifies, rather than contradicts, a deposition. Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1031 (8th Cir. 2000). The affidavit not only contradicts the deposition testimony; it also contradicts Swenson's employer's (Manor) answer filed in this court admitting that Livingston was granted leave without pay following the birth of her son. The affidavit should not and will not be considered.

[¶35]   The Melissa Schurch affidavit does not contradict prior sworn testimony. The affidavit's purpose is to clarify a note written by Schurch, DakotaCare's enrollment department supervisor, to her supervisor. The affidavit is not, however, relevant or material to the matters pending and will not be considered.

13

## ORDER

[¶36]   Based upon the foregoing,

[¶37]   IT IS ORDERED:

1. Defendant's motion, Doc. 31, for summary judgment is denied.

2. Plaintiffs' motion for summary judgment, Doc. 36, is granted in part and denied in part.  The motion is granted as to the issues of whether plaintiff Livingston was entitled to DakotaCare healthcare benefits effective May 6, 2003, and whether at some point she was entitled to elect COBRA continuing healthcare benefits.  The motion is denied as to the issues of the length of coverage available, the premium, if any, owed, the amount of benefits owing to Sioux Valley under the assignment, whether daily penalties should be imposed, the amount of any such daily penalties, and whether attorney fees and costs should be awarded.

3. Defendant's motion, Doc. 49, to file a supplemental statement of facts with supporting affidavits is denied.

[¶38]   Dated this 20th day of January, 2006.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY

DEPUTY

(SEAL)

14